UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAMERON GAZAWAY, et al., | Case No. 23-cv-04781-NW |
| Plaintiffs, | |
| v. | **ORDER DISMISSING ACTION FOR LACK OF SUBJECT MATTER JURISDICTION AND TERMINATING AS MOOT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTION AND MOTION TO EXCLUDE** |
| JARED ISAACMAN, ADMINISTRATOR, NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, | |
| Defendant. | Re: ECF Nos. 165, 166 |

Plaintiffs Cameron Gazaway and Robert Wilson allege that Defendant Jared Isaacman, Administrator for the National Aeronautics and Space Administration ("NASA"), discriminated against them on account of their age, race, and religion, and retaliated against them when they complained of that discrimination. On March 20, 2026, NASA filed a motion for summary judgment, as well as a *Daubert* motion and motion to exclude Plaintiffs' experts. ECF No. 166 ("MSJ"); ECF No. 165 ("*Daubert* Mot.").[1]

On May 15, 2026, the Court ordered supplemental briefing on the question of whether the Court had subject matter jurisdiction over the action. ECF No. 177; *see* ECF No. 178 ("NASA Suppl. Br."); ECF No. 183 ("Pls. Suppl. Br.").[2]

On June 10, 2026, the Court heard oral argument on the issue of subject matter jurisdiction. ECF No. 186. Having considered the parties' arguments and the relevant legal

---

[1] Record citations are to material in the Electronic Case File ("ECF"); unless otherwise noted, pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] The Court struck Plaintiffs' first supplemental brief, as Plaintiffs exceeded the five-page limit without first obtaining leave to file extra pages. ECF Nos. 180, 182; *see* ECF No. 177 at 2.

United States District Court
Northern District of California

authority, the Court DISMISSES this action for lack of subject matter jurisdiction and TERMINATES AS MOOT NASA's motion for summary judgment and *Daubert* motion and motion to exclude Plaintiffs' experts.

## I.   BACKGROUND[3]

### A.   Fire Protection Services at Ames Research Center

NASA's Ames Research Center ("ARC") is a research and development center located at Moffett Airfield near Mountain View, California.  NASA contracts with private companies to provide security services, including fire protection services, at ARC.  On July 23, 2015, NASA awarded a contract to American Paragon Protective Services ("APPS") to provide security services at ARC.  ECF No. 166-4 (APPS contract).  APPS in turn subcontracted fire protection services for ARC to Fiore Industries, Inc.

### B.   Performance Work Statement

The APPS contract incorporates a Performance Work Statement ("PWS").  ECF No. 166-5 (PWS).  Under the PWS,

> [t]he Contractor shall provide all labor, materials, supervision, equipment, transportation, management, except as otherwise specified in the contract and the Contractor shall use its best judgment regarding determination of efficient and appropriate staffing levels to ensure that the facility is covered on a 24 hour/7 day per week basis necessary to successfully perform the requirements set forth herein.

*Id.* at 5; *see id.* at 6 ("[T]he Contractor shall be responsible for performing the day-to-day operations of ARC's protective services as required by the PWS, 7 days per week and 24 hours per day.").

Section 8.0 of the PWS concerns Fire Services.  *Id.* at 44–56; *see id.* at 44 ("Fire Services encompasses the protection of people, property, facilities, and assets at ARC in compliance with existing or future federal, state, and local mutual aid arrangements.  Protection may include structural, Aircraft Rescue Firefighting (ARFF), hazmat, medical, and tactical rescue.").  As a general matter,

---

[3] The background facts are drawn from the parties' briefs and accompanying exhibits.

United States District Court
Northern District of California

The Contractor shall:

1. Provide a professionally managed, comprehensive fire rescue services program that complies with the following: NASA-STD-8719.11, NASA Safety Standard for Fire Protection; National Fire Protection Association (NFPA) codes and standards; state standards and regulations as applicable; and NPR 8715.3, NASA General Safety Program Requirements.

2. Develop, maintain, and implement a Fire Protection Program Plan in accordance with Section J.1 (a), Attachment 3, CDRL Report 16.

3. Operate and maintain Fire Services vehicles, which include two (2) engines, one (1) rescue vehicle, one (1) Quint, one (1) P-4 ARFF vehicle, two (2) T-1000 ARFF vehicles, one (1) T-3000 ARFF vehicle, and associated trailers.

4. Provide an appropriately trained and qualified staff consisting of a minimum of thirteen (13) Fire Services employees to provide the work identified in this Section, including 8.0 through 8.6. Note: If additional staff are necessary, then a separate task order will be utilized.

*Id.* at 44–45.  The PWS also includes the Contractor's specific responsibilities regarding fire operations and firefighting, aircraft rescue and firefighting, tactical rescue, hazardous material emergency response support, fire services training and certifications, and fire prevention.  *Id.* at 45–56, 80–83.

Appendix M lists the minimum personnel qualifications for firefighters.  *Id.* at 80–83. Among other "basic qualifications that apply to all individuals employed or being considered for employment as a firefighter[,]" battalion chiefs are required to have an associate's degree in fire science.  *Id.* at 80, 83.

C.      **NASA Fire Services Contract**

In 2020, NASA announced that it would award a regional NASA Fire Services Contract ("NFSC") that would cover several NASA locations, including ARC.  The NSFC would become effective at ARC on October 1, 2022.[4]

[4] The parties each reference and attach the NFSC provisions, as relevant to their respective filings. ECF No. 166-8 (Forhy Decl.) ¶ 4 ("A copy of the NFSC, including its Performance Work Statement, is attached as Exhibit A."); ECF No. 166-9 (NFSC attached as Exhibit A to the Forhy Declaration); Suppl. Wilson Decl. ¶ 4 ("A true and correct copy of the salary ranges set by NASA for a Battalion Chief Operations (my position) set forth in the NFSC is attached hereto as Exhibit 4."); ECF No. 183-2 at 18–25 (excerpts of the NFSC attached as Exhibit 4 to the Supplemental Wilson Declaration).  Although first page of Exhibit A to the Forhy Declaration and the Exhibit 4 to the Wilson Declaration are identical, they bear different Bates numbers. *Compare* ECF

The NFSC consisted of a main document, a PWS, and PWS annexes that were specific to each location.  On April 30, 2021, NASA published a draft NFSC, including PWS annexes.  The PWS annex specific to ARC required battalion chiefs to have an "Associate [*sic*] degree or higher in Fire Science."  ECF No. 166-9 at 128.  On June 4, 2021, NASA published an updated draft NFCS and opened it up for bidding.  NASA awarded the NSFC to Chenega Global Services, LLC in October 2021.  Chenega subcontracted fire protection services to Fiore.

### D.    Plaintiffs[5]

#### 1.    Gazaway

Gazaway "is an African American man born in 1969"; he is a Messianic Christian.  Gazaway Decl. ¶¶ 8, 11.  In 1994, Gazaway "was hired as a Firefighter by a predecessor of Fiore[,]" and he was promoted to battalion chief in 2001.[6]  *Id.* at ¶ 3.  In 2009, Gazaway earned an AA degree in Business, with coursework in Fire Sciences.

In a letter dated May 18, 2017, Fiore approved Gazaway's "request for a religious accommodation with certain restrictions[.]"  ECF No. 168-2 at 29; *id.* at 30 ("We are pleased that we are able to accommodate your request while complying with the OSHA and PWS requirements."); Gazaway Decl. ¶ 11 (authenticating the "copy of the religious accommodation provided to me by Fiore Industries, Inc.").  The letter is signed by Human Resources Manager

---

No. 166-9 at 2 (bearing Bates number NASA-001772) *with* ECF No. 183-2 at 18 (bearing Bates number NASA-00184912).  The two exhibits appear to be different productions of the NFSC, and portions of the excerpts attached as Exhibit 4 to the Wilson Declaration list prices for services and hourly rates that are not included in Exhibit A to the Forhy Declaration.  *Compare* ECF No. 183-2 at 23–25 *with* ECF No. 166-9.  The Court also notes that Plaintiffs redacted portions of Exhibit 4 that show the total price of the services but did so without filing a motion to seal, in violation of Civil Local Rule 79-5.  ECF No. 183-2 at 23–25; Civ. L.R. 79-5(b) ("A party must file a motion to seal a document at the same time that the party submits the document.").  There is nothing to suggest that a federal statute permits filing the document under seal, nor has the document been the subject of a prior motion to seal.  *See* Civ. L.R. 79-5(b) ("A party need not file a motion to seal if a federal statute or a prior court order in the same case expressly authorizes the party to file certain documents (or portions of documents) under seal.").

[5] Citations to the Gazaway Declaration refer to pages 1–4 of ECF No. 168-2, and citations to the Wilson Declaration refer to pages 1–4 of ECF No. 168-3.

[6] Gazaway declares that, "[o]n February 1, 1994, I was hired for my dream job as a Firefighter by a predecessor of Fiore with joint employer NASA."  Gazaway Decl. ¶ 3.  Whether NASA is indeed a joint employer is a disputed question of law that is addressed in this Order.

United States District Court
Northern District of California

Emily Miera and is printed on Fiore letterhead.  ECF No. 168-2 at 29–30.

Specifically, Fiore allowed Gazaway to grow a beard of "no more than 2 inches from the chin."  *Id.*  But "[d]ue to unusual circumstances" in which Gazaway may "be required to don a SCBA [self-contained breathing apparatus]," Fiore was "not able to withdraw the PWS requirement for the annual fit testing per the OSHA 1910.134 regulation."  *Id.*; *see* 28 C.F.R. § 1910.134(b) ("Fit test means the use of a protocol to qualitatively or quantitatively evaluate the fit of a respirator on an individual."); *id.* ("Self-contained breathing apparatus (SCBA) means an atmosphere-supplying respirator for which the breathing air source is designed to be carried by the user.").  Gazaway was therefore "required to shave prior to [his] fit test each year."  ECF No. 168-2 at 29.

Fiore also "grant[ed] [Gazaway's] request to wear fringes" "if tucked into clothing when in uniform to maintain a professional appearance and in accordance with the PWS required uniform standard in compliance with NASA policy."  *Id.* at 29–30.

In addition, Fiori allowed Gazaway to "trade shifts for High Holy Days and Shabbat per the current shift trade policy" and could "use vacation when . . . unable to arrange for a shift trade provided it [did] not interfere with mission needs, such as mandatory training that cannot be done on another day."  *Id.* at 30.

### 2.    Wilson

Wilson is "a white man, born in 1969."  Wilson Decl. ¶ 7.  He does not practice any religion.  ECF No. 166-17 at 14:1–2.  Like Gazaway, Wilson "was hired by a predecessor of Fiore" in 1994.[7]  Wilson Decl. ¶ 3.  In 1999, Wilson was promoted to battalion chief.  Wilson Decl. ¶ 3.  In 2009, Wilson earned an AA in General Studies, with coursework in Fire Sciences.  *Id.*

### E.    Allegations of Discrimination and Retaliation

Plaintiffs worked together at ARC's Fire Department.  It is undisputed that they reported to

_____

[7] Wilson declares that "[o]n February 1, 1994, I was hired as a Firefighter by predecessor of Fiore with joint employer NASA."  Wilson Decl. ¶ 3.

Fire Chief William Bonner, a Fiore employee.  ECF No. 168-2 at 15, 16; ECF No. 168-3 at 14, 15. Plaintiffs contend Keith Siuda, a NASA employee, was also their direct supervisor.[8]

Between 2018 and 2022, Plaintiffs allegedly experienced discrimination, harassment, and retaliation on account of their age, race, and religion—primarily by Bonner and Siuda.  Plaintiffs complained of this conduct to Congresswoman Anna Eschoo, Fiore, NASA management, and NASA's Office of Diversity and Equal Opportunity ("ODEO").

Plaintiffs claim that Siuda added into the NSFC the requirement that battalion chiefs have an associate's degree in fire science knowing that Plaintiffs did not have that particular degree, enforced that educational requirement despite never having done so before, and declined to provide Plaintiffs with a waiver or an extension of the October 1, 2022 compliance deadline, even though Plaintiffs had enrolled in a university to obtain that additional degree.

Plaintiffs were terminated on September 30, 2022.  Plaintiffs allege that their termination was a retaliatory response to their complaints of discrimination, harassment, and retaliation.

### F.    Procedural History

Plaintiffs initiated this action on September 18, 2023, and filed a first amended complaint ("FAC") on December 18, 2023, asserting claims of: age, race, and religious discrimination; association discrimination; retaliation; and wrongful termination.  *See* ECF Nos. 1, 43.  After the Court dismissed the FAC with leave to amend, Plaintiffs filed their second amended complaint ("SAC").  ECF Nos. 80, 84.  The SAC asserted claims for (1) Age Discrimination in Violation of the Age Discrimination in Employment Act ("ADEA") and Title VII; (2) Race Discrimination in violation of Title VII; (3) Hostile Work Environment and Harassment in Violation of Title VII;

---

[8] Siuda's exact title is unclear.  Plaintiffs identify Siuda in various documents as a "Manager, Fire Protection POC";  "Emergency Manager, Contracting Officer Representative ['COR'] and Fire Marshall"; "Fire Protection Director at NASA/Assistant COR"; "COR for Protective Service"; and "Supervisor Fire Chief."  ECF No. 166-13 at 8; Gazaway Decl. ¶ 12; ECF No. 168-2 at 15, 16; Wilson Decl. ¶ 10; ECF No. 168-3 at 14, 15.  A February 9, 2009 letter from Siuda identifies his title as "COTR" (contracting officer's technical representative).  ECF No. 168-2.  Siuda's signature block in a February 10, 2020 email identifies him as "Fire Marshal/AHJ [¶] Emergency Manager [¶] Protective Services COR."  ECF No. 183-1 at 19.  To the extent Siuda's title changed during the events relevant to this case, the record is insufficiently clear as to when such changes occurred.

United States District Court
Northern District of California

(4) Retaliation in Violation of Title VII; and, (5) Wrongful Termination in Violation of Title VII. ECF No. 84 ¶¶ 64–121.

NASA moved to dismiss the SAC for lack of subject matter jurisdiction, among other things. ECF No. 86. Specifically, NASA argued that Plaintiffs failed to plead facts that NASA is a joint employer and, as such, NASA is entitled to sovereign immunity against claims from non-employees such as Plaintiffs. *Id.* at 13–14. On April 11, 2025, the Court found that Plaintiffs had adequately pleaded facts that NASA is a joint employer. ECF No. 112 at 4–8. The Court therefore denied NASA's motion to dismiss for lack of jurisdiction, but did so "without prejudice to renew it as a factual, and not a facial attack, or to address the issue in a motion for summary judgment." *Id.* at 8. The Court otherwise granted NASA's motion to dismiss the Title VII claims with leave to amend. *Id.* at 9–12.

Plaintiffs filed the operative third amended complaint ("TAC") on May 2, 2025. ECF No. 117. The TAC asserts six claims: (1) Age Discrimination in Violation of ADEA; (2) Race Discrimination in violation of Title VII; (3) Religious Discrimination in violation of Title VII; (4) Hostile Work Environment and Harassment in Violation of Title VII; (5) Retaliation in Violation of Title VII; and (6) Wrongful Termination in Violation of Title VII. *Id.* ¶¶ 68–143.

## II.    SUBJECT MATTER JURISDICTION

The Court may hear evidence and make factual findings to rule on a question of subject matter jurisdiction prior to trial, so long as "the jurisdictional disputes [are] not intertwined with the merits of the claim . . . ." *See Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 944 (9th Cir. 2021) ("[B]ecause the jurisdictional disputes were not intertwined with the merits of the claim and because 'the existence of jurisdiction turn[ed] on disputed factual issues,' it fell to the district court to 'resolve those factual disputes itself.'") (quoting *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014); first brackets added); *Acevedo v. C & S Plaza Ltd. Liab. Co.*, No. 20-56318, 2021 WL 4938124, at *1 (9th Cir. Oct. 22, 2021) ("Where a jurisdictional issue is separable from the merits of a case, a court applies Rule 12(b)(1)'s standards and is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, and make findings of fact concerning the existence of jurisdiction.") (citing *Rosales v. United States*,

United States District Court
Northern District of California

824 F.2d 799, 803 (9th Cir. 1987). The Ninth Circuit has articulated several examples of when "merits issues and jurisdictional issues are intertwined" such "that the district court may not resolve disputed factual issues on a factual challenge to jurisdiction," including when: (1) "a party's right to recovery rests upon the interpretation of a federal statute that provides both the basis for the court's subject matter jurisdiction and the plaintiff's claim for relief"; (2) "the claim at issue arises under the Constitution"; and (3) "in the context of a motion to remand to state court a case involving federal-officer removal jurisdiction," there exists "a factual dispute material to federal-officer jurisdiction that is intertwined with an element of the plaintiff's claim." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1143 (9th Cir. 2024) (citation modified).

None of these situations are present in this case. Indeed, evidence as to whether NASA and Fiore are joint employers is separate and distinct from evidence of discrimination. The Court may therefore make factual findings to resolve the subject matter jurisdiction dispute.

### A. Legal Standards

#### 1. Title VII

Unless they consent to waive immunity, the United States and its agencies are immune from suit. *Ghannoum v. Wilkie*, No. CV 18-10294-CJC (SSx), 2019 WL 2970838, at *2 (C.D. Cal. Apr. 16, 2019) (citing *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981)). "Title VII includes an express waiver of sovereign immunity in suits against the government for discriminatory employment practices." *Ghannoum*, 2019 WL 2970838, at *2 (citing 42 U.S.C. §§ 2000e-5(f), 2000e-16).

Plaintiffs generally may only assert Title VII claims against their employers. *See* 42 U.S.C. § 2000e(b); *U.S. Equal Emp. Opportunity Comm'n v. Glob. Horizons, Inc.*, 915 F.3d 631, 633 (9th Cir. 2019) ("Title VII imposes liability for discrimination on 'employer[s].'") (brackets in the original). But Title VII "recognizes that two entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions." *Global Horizons*, 915 F.3d at 637. In *Global Horizons*, the Ninth Circuit adopted a common law agency test to determine whether an entity is a joint employer. 915 F.3d at 638; *see Gammon v. Wright*, No. 24-CV-05001-JSW, 2025 WL 689236, at *2 (N.D. Cal.

Mar. 4, 2025) (applying the *Global Horizons* test to determine whether federal agencies jointly employed the plaintiff together with a private third party). In that test, the "principal guidepost is the element of control—that is, the extent of control that one may exercise over the details of the work of the other." *Global Horizons*, 915 F.3d at 638–39 (internal citations omitted). The non-exhaustive list of factors to consider under this common law control test include:

> "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Id.* at 638 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992)). "There is 'no shorthand formula' for determining whether an employment relationship exists, so 'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* (quoting *Darden*, 503 U.S. at 324).

### 2.    ADEA

ADEA prohibits age discrimination in federal employment. 29 U.S.C. § 633a. Under ADEA, "[t]wo or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee." *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1093 (C.D. Cal. 2002), *dismissed*, No. CV00-11248-SVW(RZX), 2002 WL 31681865 (C.D. Cal. Mar. 6, 2002). To determine whether two employing entities are joint employers for purposes of ADEA, the Ninth Circuit courts consider the following factors: "(1) the nature and degree of control over the employees; (2) day-to-day supervision, including discipline; (3) authority to hire and fire the employee and set conditions of employment; (4) power to control pay rates or methods of payment; and (5) control of the employee records, including payroll.' *Id.* (citing *Torres-Lopez v. May*, 111 F.3d 633, 639–40 (9th Cir. 1997)) (the "*Torres-Lopez* factors").

### B.    Discussion

Given the similarities between the Title VII and ADEA joint employer tests, the Court addresses them together. As set forth below, there is no evidence that NASA is a joint employer

United States District Court
Northern District of California

such that it has waived sovereign immunity.  The evidence instead shows that, while NASA took steps to ensure that Fiore was upholding the terms of the contract, it was Fiore that controlled the details of Plaintiffs' work.

### 1.      Hiring and Termination of Fire Services Staff[9]

The PWS makes the contractor—that is, APPS or Fiore—responsible for employing Fire Services personnel at ARC.  Specifically, "[t]he Contractor shall: . . . [p]rovide an appropriately trained and qualified staff consisting of a minimum of thirteen (13) Fire Services employees to provide the work identified in this Section, including 8.0 through 8.6."  ECF No. 166-5 at 44–45.  With respect to Fire Operations and Firefighting,

> [t]he Contractor shall:
>
>  . . .
>
> 3. Provide qualified Fire Services Operations personnel 24/7 on NASA ARC/Moffett Field.
>
> 4. Provide staffing on Emergency Response Vehicles (ERV) for structural and ARFF emergency incidents sufficient to ensure safe and effective response.
>
> 5. Provide firefighters who are a minimum of 21 years of age.
>
> 6. Provide minimum staffing on cross staffed vehicles. (Examples: Engine, ARFF, Special Operations, and Hazmat Vehicles).
>
>  . . .
>
> 34. Ensure that rapid intervention teams (RIT) have been established for all responses to IDLH environments.
>
>  . . .
>
> 58. Provide shift staffing and a rapid intervention crew for emergency back-up during interior fire ground operations when they exceed initial response guidelines.

*Id.* at 45, 48, 51.  While these terms outline the general requirements for employees and how staffing should be allocated, nothing in the PWS suggests that NASA would provide personnel or be involved in the hiring  of Fire Services personnel.

Plaintiffs argue that "NASA 'could identify cost overruns' and could 'order additional

---

[9] At the hearing, the Court noted that neither party submitted Plaintiffs' employment agreements with their briefs and asked whether Plaintiffs had signed such an agreement with Fiore or NASA. Plaintiffs represented that Fiore may have issued a notice of employment, but that there otherwise was no separate employment agreement.

services' which means NASA had ultimate control over staffing the Fire Department." Pls. Suppl. Br. at 5 (quoting ECF No. 178-1 ("Suppl. Bala Decl.") ¶ 12); *see* Suppl. Bala Decl. ¶ 12 ("NASA could tell the prime contractor if the contract was not being satisfied, and it could identify cost overruns. NASA could also choose to order additional services, if necessary, from the contractor. But NASA did not have the authority to determine Fiore employees' promotions, salary, medical benefits, or other benefits. Fiore had discretion to determine these things."). Plaintiffs also rely on a November 27, 2020 email from Fire Chief Bonner stating that "[r]eductions in staffing need to be approved by NASA (Keith or Lynn) . . ." ECF No. 183-2 at 27.

These documents show that NASA had to approve modifications to the terms of the APPS contract and the PWS, which is consistent with general principles of contract law. *See Doe v. X Corp.*, No. 25-CV-07597-TLT, 2025 WL 3500543, at *5 (N.D. Cal. Nov. 6, 2025) (Under California law, "[m]odifications to [an] existing contract require the same 'assent' for a revision that the existing contract required; consent from both parties for the modifications must be obtained.") (citing *Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007)); *Douglas*, 495 F.3d at 1066 ("[A] party can't unilaterally change the terms of a contract; it must obtain the other party's consent before doing so."). It does not support Plaintiffs' contention that NASA controlled staffing, particularly where the record lacks evidence that NASA was involved in the specific aspects of staffing, such as interviewing potential candidates or determining who to hire.

Plaintiffs also fail to cite evidence in support of their argument that "NASA had discretion to re-hire or fire Plaintiffs." Pls. Suppl. Br. at 5. Plaintiffs argue that, "[i]n 2022, Suida recommended Plaintiffs' termination before October 1, 2022, and admitted that Fiore refused to terminate Plaintiffs stating, 'Nizar who is Fiore's HR rep and he pretty much said they will let them start on 1 October with that letter and will not do anything until NASA says they are not qualified.'" *Id.* (quoting ECF No. 183-3 at 58). Plaintiffs mischaracterize Siuda's email.

Siuda writes,

> As far as the BC's go, the two guys are supposed to be getting a letter from some college (not a degree, a letter) stating they have enough credits for a Bachelors in Fire Science., [*sic*] really? I talked to Nizar

11

who is Fiore's HR rep and he pretty much said they will let them start on 1 October with that letter and will not do anything until NASA says they are not qualified. I told him I would consider them out of compliance with the requirements. I said are you guys afraid of a lawsuit and he did not admit it directly but admitted they wanted us to make the decision. Not happy they are putting us in that position. Do we want to have a meeting ahead of time or wait until October hits? I am not sure what they will do if NASA is afraid to take action, it happened here with the beard issue. We kill ourselves every time so I have concerns. To me it is cut and dried they are not qualified, even with a letter.

I believe we should wait until 1 October and levy a fine right off as they know the ramifications as we do not know what they will do between now and then, although they are not advertising a BC's position yet.

ECF No. 183-3 at 58.

This email says nothing about terminating Plaintiffs for their alleged lack of qualifications.[10] At most, Siuda recommends fining Fiore for failing to comply with the NFSC, but he does not suggest that NASA take action against Plaintiffs directly. Ensuring that Fiore performs under the NSFC is not tantamount to NASA having the ability to fire Plaintiffs. *See also* ECF No. 183-3 (Siuda Dep.) at 8 ("So it was my responsibility to make sure the contract requirements were fulfilled.").

In a footnote to their amended supplemental brief, Plaintiffs' contention that "NASA had the authority to terminate any Fire Department employee (codified within the Fiore and the IAFF [International Association of Fire Fighters] in their CBA)" also lacks evidentiary support. Pls. Suppl. Br. at 5 n.1. Plaintiffs recognize that, as Battalion Chiefs, they were not part of the union and were therefore not subject to the CBA; yet Plaintiffs nevertheless assert that the terms of the CBA applied to them. Suppl. Gazaway Decl. ¶ 25; Suppl. Wilson Decl. ¶ 22.[11] Ultimately, whether the CBA applied to Plaintiffs does not matter, because the plain language of the CBA

---

[10] Although Plaintiffs are not named in this email—which, as submitted, appears to be only one email in a longer thread—Siuda's statements that "they have enough credits for a Bachelors in Fire Science" and "they are not qualified" presumably refer to Plaintiffs, and "they will let them start on 1 October" means that Fiore will let Plaintiffs start on October 1. And while this email was an exhibit to Siuda's deposition, in Plaintiffs' submissions to the Court they did not include Siuda's testimony regarding the email.

[11] Citations to the Supplemental Gazaway Declaration refer to pages 1–5 of ECF No. 183-1, and citations to the Supplemental Wilson Declaration refer to pages 1–5 of ECF No. 183-2.

12

does not show that NASA could terminate Fire Services personnel.

Section 5.2 of the CBA between Fiore and The Moffet Field Firefighters Association IAFF Local I 79 at NASA/Ames Research Center provides that:

> If the contracting agency directs that a specific employee be removed from the contract; [*sic*] any such action directed may be undertaken by the Company and shall not be subject to the grievance or arbitration procedures of this Agreement. In the event that the contracting agency expressly directs the removal of a contract employee, the Company agrees to cooperate with the Association by providing it with all relevant information concerning the incident.

ECF No. 183-2 at 16.  Plaintiffs do not explain, even if they were subject to the CBA, why their removal from the contract would amount to termination of employment.  At the hearing, the Court asked whether Fiore could move a firefighter, who had been removed from the contract, to another site at which Fiore provides fire protection services—in other words, whether a person remains a Fiore employee even if he or she is unable to work at ARC.  According to Plaintiffs' counsel, Fiore's only fire services contract was with NASA, such that removal from the contract meant that the employee had no other place to work.  Plaintiffs provided no evidence in the record to support this position.  Plaintiffs also notably did not say that a firefighter's removal from the NASA contract meant that Fiore could not transfer that firefighter to a different location, had one been available.  Fiore's inability to place an employee at a different site is not the equivalent of NASA having the power to terminate employment.

Because there is no evidence that NASA had the power to hire or terminate fire services staff, this factor weighs against joint employment.

### 2. Payment and Benefits

It is undisputed that Fiore issued Plaintiffs' paychecks; withheld federal, state, and Social Security taxes; issued Plaintiffs' W-2 forms; paid for Plaintiffs' insurance benefits; and provided Plaintiffs' retirement accounts.  Pls. Suppl. Br. at 5 ("Plaintiffs do not dispute that their salary, medical benefits, and taxes were paid by joint employer Fiore."); ECF No. 168-2 at 7–8 (Gazaway statement of earnings); *id.* at 18 (Gazaway ODEO affidavit, "Did the Agency provide you insurance?  No, Fiore provided insurance."); *id.* at 19 (Gazaway ODEO affidavit, "Who (Agency or contracting company) withheld federal, state and Social Security taxes from your paycheck?

13

Fiore"); ECF No. 178-6 (Gazaway W-2); ECF No. 178-8 (Gazaway 401k statement); ECF No. 168-3 at 11–12 (Wilson statement of earnings); *id.* at 18 (Wilson ODEO affidavit, "Did the Agency provide you insurance?  no"); *id.* (Wilson ODEO affidavit, "Who (Agency or contracting company) withheld federal, state and Social Security taxes from your paycheck? Fiore"); ECF No. 178-7 (Wilson W-2); ECF No. 178-9 (Wilson 401k statement); Suppl. Bala Decl. ¶ 12 ("NASA did not have the authority to determine Fiore employees' promotions, salary, medical benefits, or other benefits.  Fiore had discretion to determine these things.").

Plaintiffs argue that "NASA determined the hourly rate and salary range for all positions including BCs [battalion chiefs], and paid Fiore, through the general contractor, for those costs." Pls. Suppl. Br. at 5 (citing ECF No. 183-2 (NFSC excerpts) at 18–25; additional citations omitted). Plaintiffs declare that "NASA, in the NFSC, set wages and salaries for all positions under the contract." Suppl. Gazaway Decl. ¶ 26; Suppl. Wilson Decl. ¶ 23.  The record does not support this assertion, and Plaintiffs do not explain how they know that NASA set the wages and salaries. Absent evidence showing how the prices for services and hourly rates were determined—i.e., whether they were unilaterally set by NASA as Plaintiffs contend, or if they are the result of negotiations with Chenega as part of the bidding process—the fact that hourly rates and salaries are set in the NSFC, in and of itself, is not indicative of NASA's control.

Given the lack of evidence of NASA's control payment and benefits, this factor weighs against finding NASA is a joint employer.

### 3.     Personnel Actions

Fiore also approved personnel actions—including salary increases, leave requests, and Gazaway's religious exemption—and memorialized such actions in documents bearing Fiore letterhead and signed by Fiore employees (for example Fiore's Fire Chief William Bonner, Fiore's Program Manager Elaine Harlan, Fiore's corporate executive Bill Miera, or Fiore's HR employee Susan Marguez).[12]  ECF No. 168-2 at 6 (Gazaway personnel action form); *id.* at 18 (Gazaway

---

[12] It is undisputed that Bonner is a Fiore employee.  *See* ECF No. 178-4 at 3 (Bonner EEOC affidavit, "Identify your position, title, grade and series. Response: Fire Chief (Fiori employee)"); ECF No. 168-2 at 16 (Gazaway EEOC affidavit identifying "Fiore – William Bonner" as his supervisor); ECF No. 168-3 at 15 (Wilson EEOC affidavit, "My direct supervisors were Fire Chief

ODEO affidavit, "To whom did you submit leave requests? Chief Bonner"; leave "covered by Fiore"); *id.* at 29–30 (religious accommodation letter); ECF No. 168-3 at 10 (Wilson personnel action form); *id.* at 18 (Wilson ODEO affidavit, "To whom did you submit leave requests? Chief Bonner – Fiore"); Gazaway Decl. ¶ 11 ("A true and correct copy of the religious accommodation provided to me by Fiore Industries, Inc. is attached . . ."). Moreover, the May 18, 2017 letter approving Gazaway's religious accommodation states that Gazaway should "[p]lease feel free to contact [Fiore's] Human Resources if you have any questions or concerns." ECF No. 168-2 at 30. The letter does not direct Gazaway to submit inquiries to NASA or otherwise suggest that it was NASA who ultimately approved Gazaway's accommodation.

NASA's lack of involvement in these personnel actions further indicates that NASA is not a joint employer.

### 4. Training and Qualifications

Plaintiffs argue that, as additional evidence of a joint employer relationship, "NASA paid for Plaintiffs' associate's degrees (which Suida admitted), coursework, and all training throughout their career." Pls. Suppl. Br. at 5. At the hearing, the Court sought clarification from Plaintiffs as to how NASA paid for Plaintiffs' education and training—for instance, whether: Plaintiffs paid their tuition or up front and then sought reimbursement from NASA or Fiore; NASA paid the college or training directly; NASA provided Plaintiffs with the funds up front; or NASA provided the money to Fiore, and Fiore issued payment to Plaintiffs. Plaintiffs' counsel was uncertain as to how payments were made but suggested that NASA paid the contractor or the entity providing the training.

Indeed, there is no evidence that payments from NASA ever flowed to Plaintiffs directly.[13] It appears that APPS paid for training and then requested reimbursement from NASA:

---

– Bill Bonner (Fiore employee) . . .").

[13] Siuda appears to have testified about how NASA paid for Plaintiffs' degrees, but Plaintiffs' excerpts of his deposition transcript do not include his complete response. ECF No. 183-3 at 12 ("So when NASA paid for their degrees, it was under a different contract and the options for an associate's degree was either general studies, business or fire science, and they were given . . ."). The parties also did not submit the contract that Siuda references in his testimony.

In accordance with the PWS, Appendix M – Firefighter/Officer Minimum Personnel Qualifications, item #2, "Firefighters and Fire Officers not meeting minimum standards at the beginning of their employment shall have 180 days to comply." ***This language supports APPS' request for reimbursement for the training. NASA has also historically reimbursed APPS for these expenses.***

ECF No. 183-3 at 114 (emphasis added).[14] Thus, to the extent NASA paid for training, it was two steps removed from Plaintiffs—the payment went to APPS, the contractor that subcontracted ARC fire protection services to Fiore, which employed Plaintiffs. This undermines Plaintiffs' joint employer theory.

### 5.        Management of Day-to-Day Affairs

Plaintiffs argue that NASA directed Plaintiffs' daily activities through the implementation of the Standard Operating Procedures for Operations Battalion Chiefs Duties and Responsibilities (the "2020 SOP"), which NASA approved and modified. Pls. Suppl. Br. at 2–4; *see* ECF No. 183-1 at 7–17. But contrary to Plaintiffs' contention, the 2020 SOP is not evidence of NASA's control over Plaintiffs' daily activities. The PWS requires the Contractor—that is, Fiore—to "[d]evelop, maintain, and update *Standard Operating Procedures (SOP)* . . . for operations conducted under this PWS." ECF No. 166-5 at 8 (emphasis in the original). Specifically, as to fire services, the PWS provides that

> [t]he Contractor shall:
>
> 1. Provide a professionally managed, comprehensive fire rescue services program that complies with the following: NASA-STD-8719.11, NASA Safety Standard for Fire Protection; National Fire Protection Association (NFPA) codes and standards; state standards and regulations as applicable; and NPR 8715.3, NASA General Safety Program Requirements.
>
> 2. Develop, maintain, and implement a Fire Protection Program Plan in accordance with Section J.1(a), Attachment 3, CDRL Report 16.
>
> . . .
>
> 27. Develop an EMS Program and ensure coordination with the ARC Medical Services Officer.
>
> . . .

---

[14] This email is from Mariah E. Knefely, Director of Contracts at AEPS Corporation to NASA Contracting Specialist Jamie Schoemaker. The parties do not explain what AEPS Corporation is, or the nature of its involvement with NASA.

United States District Court
Northern District of California

> 30. Update pre-fire plans annually and retain the plans on first response and command vehicles.
>
> 31. Manage a Fire Services Safety section. This section shall be managed by a certified individual with the responsibility of providing oversight of the development of overall safety of operations, to include all rescue responses, fire suppression, emergency medical services, hazardous materials mitigation, special operations, and occupational safety.
>
> . . .
>
> 43. Establish and implement an IDLH rescue Program in accordance with OSHA 29 CFR.

ECF No. 166-5 at 44–49. To the extent executing these responsibilities requires developing SOPs, that too falls on Fiore. Nothing in the PWS suggests that NASA dictates what goes into the SOPs beyond complying with applicable rules and regulations. The fact that NASA had to approve and could modify SOPs is not indicative of control over Plaintiffs' daily activities.

The purpose of the September 29, 2020 SOP is "[t]o establish formalized responsibilities for the Operations Battalion Chiefs and those designated to fill that role at the NASA Ames Fire Department and to identify the duties and activities they are required to perform." ECF No. 178-2 at 2. Bonner reviewed the September 29, 2020 SOP with Gazaway and provided it to him. ECF No. 180-1 at 7 ("This email is to confirm that this afternoon we met and reviewed the attached and updated SOP covering the duties and responsibilities of an Operation Battalion Chief."). Bonner's name also appears at the end of the document. ECF No. 178-2 at 9.

Plaintiffs argue that "NASA approved and modified all SOPs at its discretion" and that "Siuda . . . admitted this, testifying that 'standard operating procedures . . . are written by the contractor and approved by the government'." Pls. Suppl. Br. at 2 (citing ECF No. 183-3 at 8–9). Plaintiffs cherry-pick and overstate Siuda's deposition testimony. Suida testified that

> It was the fire chief's responsibility to ensure that the three battalion chiefs and subsequently the captains and the firefighters did the appropriate things based off the way their standard operating procedures, which are written by the contractor and approved by the government, they're, you know -- they did have -- I know each contractor has in-house things the way they did them, so that was the fire chief's job to make sure they complied with those.
>
> I wasn't necessarily in the loop on those, but you know, they wanted their people to operate a certain way, you know, like all firefighters will wear all, you know, personal protective equipment. You know,

17

that was -- that's kind of getting down in the weeds, but that's something that the contractor would do to make sure they were complying with the overarching NFPA 1500 safety programs and what they should or shouldn't do at a fire scene. So that was always the fire chief no matter what happened.

ECF No. 183-3 at 8–9. In other words, Fiore wrote the SOP and ensured that the procedures in the SOP complied with Fiore's policies or preferences. That NASA approved and could modify the SOP is not indicative of NASA's control over Plaintiffs' daily activities.

Plaintiffs also point to the fact that "NASA required Plaintiffs to call NASA senior leadership at all emergency or incident scenes." Pls. Suppl. Br. at 3. This too does not indicate a joint employer relationship. It is entirely reasonable that NASA, as the contracting agency and owner of the premises, expected to be informed of any onsite emergencies that required the fire department to respond.

In sum, there is no evidence that NASA controlled Plaintiffs' day-to-day affairs. This weighs against joint employment.

### 6.    Instrumentalities and Tools

As additional evidence of NASA's control, Plaintiffs argue they were required to wear NASA uniforms, had business cards with NASA's logo, and had email addresses with a @nasa.gov domain. *Id.* at 4. When considered in the context of the aforementioned factors, this is insufficient to make NASA a joint employer.

A uniform bearing NASA's logo indicates, for instance, that Plaintiffs are authorized to be on the premises. *See Banks v. St. Francis Health Ctr., Inc.*, No. 15-CV-2602-JAR, 2016 WL 6905581, at *15 (D. Kan. Nov. 21, 2016) ("Even where the plaintiff is required to wear a provided badge or uniform, this consideration is not sufficient standing alone to prove a joint employment relationship. Given the safety concerns in hospitals, requiring Plaintiff to wear a badge does not go beyond the average vendor-client relationship.") (footnote omitted); *see also* ECF No. 166-5 at 9 (The contractor shall "[i]mplement and enforce a standard dress code policy to ensure that contract employees wear either appropriate civilian attire or the prescribed duty uniform while on-duty."). Plaintiffs' business cards are also insufficient to establish that NASA was Plaintiffs' joint employer. *See McAdory v. Vail Techs.*, No. 16–cv–886 (LMB/TCB), 2017 WL 1822276, at *5

18

(E.D. Va. May 4, 2017), aff'd, 695 F. App'x 730 (4th Cir. 2017) (Plaintiff "points to [defendant] providing her with a laptop, an email account, and business cards, and she argues that her work assignments resembled those of the full-time [defendant] employees assigned to the same project. These facts are not enough to establish that [defendant] was the plaintiff's joint employer.")

Plaintiffs' @nasa.gov emails are likewise not dispositive of a joint employer relationship. As Siuda explained, "everybody that works at NASA, contract, civil servant, whatever, you do get your own E-mail . . . the contractors would say at nasa.gov, but somewhere in there it would say Fiore or whatever the contractor's name was, you know." ECF No. 183-3 at 23. Indeed, Plaintiffs' emails appear with a "[FIORE]" notation:

| From: | Bala, Lynn M (ARC-JP) |
|---|---|
| To: | ARC-DL-911dispatch; ARC-DL-PoliceOperations; Wheaton, Richard T. (ARC-JP)[American-Paragon Protective Services, LLC]; Knopp, Steven W. (ARC-JP)[American-Paragon Protective Services, LLC]; Bonner, William F. (ARC-JP)[FIORE]; Wilson, Robert A. (ARC-JP)[FIORE]; Gazaway, Cameron J. (ARC-JP)[FIORE]; King, Ricky E. (ARC-JP)[FIORE] |
| Cc: | Ward, Brandon P. (ARC-JP); Reyes, George (ARC-JP); Meier, Dirk C. (ARC-JP); Sylvain, Michael (ARC-JP); Siuda, Keith M. (ARC-JP); Bala, Lynn M (ARC-JP) |
| Subject: | Protective Services Government Notifications |
| Date: | Tuesday, November 16, 2021 1:37:35 PM |
| Attachments: | image001.jpg |

ECF No. 183-2 at 7. The fact that Plaintiffs' and other Fiore employees' email accounts were distinguished from those of NASA employees further weighs against finding that NASA is a joint employer.

III.    CONCLUSION

For the foregoing reasons, the Court DISMISSES the action WITH PREJUDICE for lack of subject matter jurisdiction. Because jurisdiction is lacking, the Court TERMINATES AS MOOT NASA's motion for summary judgment and *Daubert* motion and motion to exclude Plaintiffs' experts. ECF Nos. 165, 166.

**IT IS SO ORDERED.**

Dated: June 22, 2026

_____
Noël Wise
United States District Judge